FILED

2010 JUL 26 PM 1:05

CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. LOS ANGELES

BY ________

NIALL P. McCARTHY (SBN 160175)
nmccarthy@cpmlegal.com
JUSTIN T. BERGER (SBN 250346)
jberger@cpmlegal.com
**COTCHETT, PITRE & McCARTHY**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 692-3606

MAEVE ELISE BROWN (SBN 137512)
mbrown@heraca.org
ELIZABETH S. LETCHER (SBN 172986)
eletcher@heraca.org
NOAH ZINNER (SBN 247581)
nzinner@heraca.org
**HOUSING AND ECONOMIC RIGHTS ADVOCATES**
P.O. Box 29435
1814 Franklin St., Suite 1040
Oakland, CA 94612
Telephone: (510) 271-8443
Facsimile: (510) 868-4521

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEBRA MATTHEWS, an individual; on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BAC HOME LOANS SERVICING, LP; BANK OF AMERICA N.A.; and DOES 1 through ~~20~~ 10, inclusive,<br><br>Defendants. | Case No. 10-cv-5506 MMM (FMO)<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES, RESTITUTION, AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

BY FAX

LAW OFFICES COTCHETT, PITRE & McCARTHY

# TABLE OF CONTENTS

**I. INTRODUCTION** . . . . . 1

**II. JURISDICTION AND VENUE** . . . . . 4

**III. PARTIES** . . . . . 4

A. PLAINTIFF . . . . . 4

B. DEFENDANTS . . . . . 5

C. OTHER DEFENDANTS . . . . . 5

D. AGENCY . . . . . 5

E. AIDING AND ABETTING/CONSPIRACY . . . . . 5

F. ALTER EGO . . . . . 6

**IV. TOLLING OF STATUTES OF LIMITATION BY FRAUDULENT CONCEALMENT** . . . . . 6

**V. FACTUAL ALLEGATIONS** . . . . . 6

A. THE FORECLOSURE CRISIS . . . . . 6

B. THE HAMP PROGRAM . . . . . 7

C. BANK OF AMERICA'S OBLIGATIONS UNDER HAMP . . . . . 8

D. BANK OF AMERICA'S PRACTICES . . . . . 11

E. PLAINTIFF'S EXPERIENCE WITH BANK OF AMERICA . . . . . 13

**VII. CLASS ACTION ALLEGATIONS** . . . . . 18

**VIII. CAUSES OF ACTION** . . . . . 21

FIRST CAUSE OF ACTION
BREACH OF CONTRACT
(Breach of Contract
Against All Defendants) . . . . . 21

SECOND CAUSE OF ACTION
BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
(Breach of Covenant of Good Faith and Fair Dealing
Against All Defendants) . . . . . 22

THIRD CAUSE OF ACTION
BREACH OF CONTRACT
(Breach of SPA Contract
Against All Defendants) . . . . . 24

FOURTH CAUSE OF ACTION
PROMISSORY ESTOPPEL, IN THE ALTERNATIVE
(Against All Defendants). . . . . 26

FIFTH CAUSE OF ACTION
VIOLATION OF STATE FAIR DEBT COLLECTION ACT
(Violation of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.*
Against All Defendants). . . . . 27

SIXTH CAUSE OF ACTION
VIOLATION OF THE UNFAIR COMPETITION LAW
(For Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et. seq.*
Against All Defendants). . . . . 28

**PRAYER FOR RELIEF**. . . . . 31

**DEMAND FOR JURY TRIAL**. . . . . 32

## I. INTRODUCTION

1. Hundreds of thousands of Californians have had trouble paying their mortgages over the past several years. For most, such as Plaintiff Debra Matthews, this trouble has been a sad end to years of saving and planning, brought on by an unforseen reduction or elimination of employment, and an unforseen plummet in housing values. In recognition of these difficult circumstances, the federal government has instituted several policies over the past two years to ensure that the lending banks – including those which have received billions of dollars in taxpayer bailouts – give homeowners every reasonable opportunity possible to stay in their homes.

2. For example, as part of the Troubled Asset Relief Program ("TARP") – which has become commonly referred to as "the bailout" of Wall Street – the United States Treasury Department required banks receiving federal funds to participate in the Home Affordable Modification Program ("HAMP"). Defendant Bank of America received **$45 billion** in TARP funds in 2008 and 2009. As with all other TARP recipients, in exchange for those funds, Bank of America agreed to participate in the HAMP program.

3. The HAMP program requires banks to offer loan modifications to certain homeowners who are having trouble meeting their mortgage payments. The Treasury Department has issued detailed guidelines to the banks participating in the HAMP program. Among other things, the HAMP guidelines require the banks to:

- Review their portfolio of loans and affirmatively identify candidates for modification;
- Collect financial information from homeowners identified as potential modification candidates;

/ / /

- Calculate a proposed modification amount for modification candidates, and allow candidates to make this modified payment amount for a three-month "trial period";
- Provide permanent modifications to all homeowners who make the trial period payments and comply with all pertinent terms; and
- Provide *written* notice to every homeowner that has been evaluated for a loan modification.

4. Additionally, the HAMP programs prevents banks from engaging in certain activity, such as:

- Proceeding with any foreclosure action. Any scheduled foreclosure sale or other activity must be suspended until the borrower been considered and found ineligible for modification or other foreclosure prevention options.
- Requiring a homeowner to make a "good faith" or contribution payment pending the processing of a trial period plan before the plan actually starts.
- Soliciting borrowers to opt out of consideration for HAMP during the temporary review period.
- Assessing prepayment penalties for full or partial prepayment as part of a modification.

5. Despite agreeing to abide by these requirements and prohibitions in exchange for billions of dollars in taxpayer TARP funds, Defendants BAC Home Loans Servicing, LP and Bank of America N.A. (collectively, "Bank of America"), have repeatedly and systematically flaunted the HAMP guidelines, and have intentionally misled thousands – perhaps hundreds of thousands – of homeowners into a loan modification process that amounts to little more than a black hole. Homeowners who request to be evaluated for a modification under HAMP

routinely face unexplained delays, and go months with no communication from Bank of America after providing all information requested by Bank of America. Homeowners who attempt to contact Bank of America by telephone are placed on hold for hours, and are transferred back and forth between different representatives, who often providing conflicting information and instructions. Worse yet, almost without fail, homeowners mail or fax requested information to Bank of America (often by certified mail), only to be falsely told by Bank of America that it did not receive the requested information.

6. Many homeowners are told that they qualify for a trial period plan, but are never sent an official trial plan agreement. Bank of America regularly tells homeowners they qualify for a trial payment, orally or via e-mail, tells them the amount, and tells them to begin paying, but never sends an official trial plan agreement. In such instances, even after the homeowner makes the trial payments, Bank of America later denies that the homeowner was ever eligible for a trial plan, or the HAMP program.

7. For those who are lucky enough to receive an official HAMP trial plan agreement, and who comply with all terms of the trial plan, Bank of America routinely denies permanent modification, without justification.

8. Simply put, Bank of America has intentionally set up its loan modification program to fail. It instituted a program in order to feign compliance with the TARP conditions, but never had any intention to allow widespread modification for homeowners in need. The statistics reflect this reality. In January 2010, the U.S. Treasury reported that Bank of America had 1,066,025 HAMP-eligible loans in its portfolio. Trial periods had been started on only 237,766 of these loans. Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and just over 1% of the eligible pool).

/ / /

9. For these reasons, detailed below, Plaintiff Debra Matthews, on behalf of all similarly situated Californians, seeks damages from Bank of America and an end to these practices.

## II. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the Class are citizens of a State different from the Defendants.

11. This Court also has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 in that the Plaintiffs are intended, third-party beneficiaries to a contract between Bank of America and the U.S. Treasury that was entered into pursuant to and under the direction of TARP. 12 U.S.C. § 5201 *et seq*.

12. This Court has personal jurisdiction over the parties in this action by the fact that Defendants are corporations that are licensed to do business in the state of California or otherwise conduct business in the state of California.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as Defendant BAC Home Loan Servicing, LP, is headquartered in this district, and the unlawful practices therefore are alleged to have been committed in this District, all Defendants reside in California and in this District within the meaning of 28 U.S.C. § 1391(c), and Defendants regularly conduct business in this District.

## III. PARTIES

### A. PLAINTIFF

14. DEBRA MATTHEWS is, and at all times mentioned herein was, a resident of Solano County. Plaintiff was and is the rightful sole owner of a single

family home in Vacaville, California, which at all pertinent times has been, and continues to be, Plaintiff's primary residence.

**B. DEFENDANTS**

15. Defendant BAC HOME LOANS SERVICING, LP (formerly known as COUNTRYWIDE HOME LOANS SERVICING, LP) is a subsidiary of BANK OF AMERICA, with its headquarters in Calabasas, California.

16. Defendant BANK OF AMERICA, N.A. ("BANK OF AMERICA"), is and at all times relevant hereto was a mortgage lender headquartered in Charlotte, North Carolina, and doing business in Los Angeles County.

**C. OTHER DEFENDANTS**

17. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 20 are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names pursuant to Code of Civil Procedure section 474. Plaintiff alleges that each of said fictitious Defendants is in some manner responsible for the acts hereinafter set forth. Plaintiff will amend this Complaint to show the true names and capacities of these DOE Defendants, as well as the manner in which each fictitious Defendant is responsible, when these facts are ascertained.

**D. AGENCY**

18. Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned each of the Defendants was an agent, servant, employee, and/or joint venturer of each of the remaining Defendants, and was at all times acting within the course and scope of such agency, service, employment, and/or joint venture, and each Defendant has ratified, approved, and authorized the acts of each of the remaining Defendants with full knowledge of said facts.

**E. AIDING AND ABETTING/CONSPIRACY**

19. Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their

obligations to Plaintiff, as alleged herein. In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its/his/her primary wrongdoing and realized that its/his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

**F. ALTER EGO**

20. There is a unity of interest between Defendants, and each acts as the alter ego of the other.

## IV. TOLLING OF STATUTES OF LIMITATION BY FRAUDULENT CONCEALMENT

21. Any applicable statutes of limitation have been tolled by Defendants' continuing, knowing and active concealment of the facts alleged herein. By virtue of Defendants' concealment and misrepresentations to Plaintiff, Plaintiff could not and did not discover Defendants' actions.

22. In the alternative, Defendants should be estopped from relying on any statutes of limitation. Defendants owed Plaintiff an affirmative duty of full and fair disclosure, but knowingly failed to honor and discharge such duty. Finally, Defendants' conduct is not barred by any statutes of limitation because Defendants' conduct constitutes an ongoing violation of Plaintiff's rights, which continues to the present.

## V. FACTUAL ALLEGATIONS

### A. THE FORECLOSURE CRISIS

23. For the past three years, the United States has been in a foreclosure crisis. In late 2009, one in eight U.S. mortgages was in foreclosure or default, and 2.8 million homeowners received foreclosure notices in 2009.

24. California has been one of the states hardest hit by this crisis. California had the highest number of foreclosures in the United States for all of

2009. RealtyTrac reports that the number of total California properties with foreclosure filings in 2009 was 632,573. This represents a nearly 21% increase over 2008 and a 153% increase from 2007. In the first quarter of 2010, California posted the nation's fourth highest foreclosure rate; during that period, California accounted for 23% of the nation's total foreclosure activity.

25. The foreclosure crisis "continues unabated," as a Congressional oversight panel stated in April 2010.

**B. THE HAMP PROGRAM**

26. Congress passed the Emergency Economic Stabilization Act of 2008, 12 U.S.C. § 5201 *et seq.*, on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, on February 17, 2009 (together, the "Act").

27. The purpose of the Act was to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and to ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

28. The Act granted the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211 *et seq.* Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.* Congress allocated up to $700 billion to the Treasury for TARP. 12 U.S.C. § 5225.

29. The Act further mandates, with regard to any assets acquired by the Secretary of the Treasury that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and

loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

30. On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency created the Making Home Affordable ("MHA") initiative to help at-risk homeowners avoid foreclosure by restructuring their mortgages.

31. The Home Affordable Modification Program, or HAMP, is the portion of the MHA initiative that provides mandatory directives for implementation, and with which Bank of America has not complied. HAMP creates a uniform loan modification protocol, and provides financial incentives for participating servicers to modify loans. The Treasury Department has allocated at least $75 billion in federal funds to HAMP, of which at least $50 billion is TARP money, to keep up to "3 to 4 million homeowners" in their homes by 2012.

**C. BANK OF AMERICA'S OBLIGATIONS UNDER HAMP**

32. Because Bank of America accepted $45 billion in federal funds and additional loan guarantees, it was and is required to participate in HAMP for the loans on which it functions as a loan "servicer." Steve R. Bailey, of Bank of America, executed a Servicer Participation Agreement ("SPA") with the federal government on April 17, 2009, making official Bank of America's participation in HAMP, and binding it to comply with the HAMP procedures.

33. The SPA executed by Mr. Bailey explicitly incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with HAMP. These documents together are referred to as the "Program Documentation" (SPA I.A.), and are incorporated by reference herein. The SPA mandates that a Participating Servicer "shall perform" the

activities described in the Program Documentation "for all mortgage loans it services." SPA I.A., 2.A.5

34. Fannie Mae issued the first "Supplemental Directive" ("SD 09-01") in April, 2009.[1/] That Directive, together with others issued since, sets out the activities Bank of America must perform "for all mortgage loans it services." (SPA § 2.A.)

35. First, Bank of America must evaluate all borrowers who are 60 or more days in default, in "imminent default," or who request a loan modification to see if the loan and borrower meet basic eligibility criteria.[2/] (SD 09-01 at 1-2, 3-4.)

---

[1] The Program Documentation also includes: Supplemental Directive 09-01 ("SD 09-01"), Apr. 6, 2009, https://www.hmpadmin.com/portal/docs/hamp_servicer/sd0901.pdf; Supplemental Directive 09-07 ("SD 09-07"), Oct. 8, 2009, https://www.hmpadmin.com/portal/docs/hamp_servicer/sd0907.pdf; Supplemental Directive 09-08 ("SD 09-08"), Nov. 3, 2009, https://www.hmpadmin.com/portal/docs/hamp_servicer/sd0908.pdf; Supplemental Directive 10-01 ("SD 10-01"), Jan. 28, 2010, https://www.hmpadmin.com/portal/docs/hamp_servicer/sd1001.pdf; Supplemental Documentation – Frequently Asked Questions – Home Affordable Modification Program ("HAMP FAQs"), Apr. 2, 2010, https://www.hmpadmin.com/portal/docs/hamp_servicer/hampfaqs.pdf; Supplemental Documentation – Frequently Asked Questions – Home Affordable Modification Program 2009-2010 Conversion Campaign ("HAMP Conversion FAQs"), Jan. 8, 2010, https://www.hmpadmin.com/portal/docs/hamp_servicer/hampconversionfaqs.pdf; Checklist for Getting Started and Participating in HAMP for Non-GSE Loans, Guidance Effective for Verified Trial Period Plans, Feb. 22, 2010 ("HAMP Checklist"), https://www.hmpadmin.com/portal/docs/hamp_servicer/hampchecklistverified.pdf; and Home Affordable Modification Program Base Net Present Value (NPV) Model Specifications ("NPV Overview"), Jun. 11, 2009, https://www.hmpadmin.com/portal/docs/hamp_servicer/npvoverview.pdf (all last visited May 13, 2010). These documents together describe the basic activities required under HAMP.

[2] Aside from criteria that require that the loan be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan must be delinquent or that default is reasonably foreseeable; that the borrower document a financial hardship, as defined in the Program Documentation, and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income. (SD 09-01 at 1-2.)

36. Next, the servicer is required to calculate whether, by taking certain modification steps such as reducing the interest rate or extending the term of the loan, the borrower's total housing payment can be reduced to 31% of the borrower's monthly income. (SD 09-01 at 8-10; HAMP Checklist at 6.) Finally, the servicer must perform a "net present value" (hereinafter "NPV") analysis, comparing the net present value of cash flow from these modified loan terms to the NPV of the loan without modification. (SD 09-01 at 4-5; NPV Overview; HAMP FAQs at 27-29, Q2314.)

37. If the NPV test yields a "positive" outcome (i.e., the value of a performing modified loan exceeds the value of foreclosing the property), the servicer is required to offer a trial modification, or "Trial Period Plan," (hereinafter "TPP") under HAMP. (SD 09-01 at 4, 14-15.) If the NPV test yields a "negative" outcome, the servicer is required to consider the borrower for other foreclosure prevention measures. (SD 09-01 at 4; SD 09-08 at 2-3.)

38. The TPP consists of a three-month period in which the homeowner makes mortgage payments based on adjusted loan terms derived from steps followed by the servicer under HAMP. (SD 09-01 at 17-18; SD 10-01 at 8.)

39. Bank of America offers TPPs to eligible homeowners through a TPP Contract, which describes the homeowner's duties and obligations. The TPP Contract promises a permanent HAMP modification for those homeowners who make the required payments under the plan and fulfill the documentation requirements. Bank of America also represents on its website, and in other standardized written and oral communications, that borrowers who successfully make the trial period payments will be given a permanent modification.

40. If the homeowner makes all the TPP monthly payments and complies with documentation requirements, then the second stage of the HAMP process is triggered and the homeowner must be offered a permanent modification. (SD 09-01 at 18; SD 10-01 at 8.)

**D. BANK OF AMERICA'S PRACTICES**

41. Bank of America has routinely failed to comply with its requirements and responsibilities under HAMP.

42. Bank of America regularly fails to evaluate borrowers' eligibility for the HAMP program or perform an NPV test in a timely manner, if at all. Bank of America also regularly instructs applicants to begin making trial payments without having evaluated the applicants' eligibility for the program. Instead, it waits to underwrite the loan and evaluate borrowers' eligibility until months after the homeowner begins making trial payments. Homeowners thus make months of trial payments (and comply with stressful and burdensome documentation requirements), without any assurance that Bank of America will comply with the HAMP guidelines and offer a permanent modification.

43. Throughout the HAMP application process, Bank of America also repeatedly and inappropriately demands that borrowers update their application materials, while warning homeowners that their modification is at risk and threatening to deny the modification if they fail to comply with the request. Typically, Bank of America requests the same document(s) over and over. In other instances, it requests documentation that is irrational or impossible to obtain – such as W-2 forms for elderly individuals surviving on social security, or self-employment profit and loss statements for wage-earning employees. Bank of America's demands that borrowers submit duplicative or unnecessary documentation creates opportunities for Bank of America to reject otherwise eligible borrowers for permanent modifications. The requests for documents are unnecessary, duplicative, burdensome, and harassing.

44. Bank of America has routinely failed to comply with the HAMP guidelines and offer permanent modifications to qualifying homeowners, instead stringing them along for months and months in trial modifications, or with no guidance whatsoever.

45. Bank of America has routinely failed to comply with the requirement that it give borrowers written notification when they are denied a HAMP modification. Within ten days of the date of determination that an official HAMP modification will not be offered, Bank of America must send a Borrower Notice that explains the primary reason for the denial in clear, non-technical language, and set out any other alternatives to foreclosure to which the borrower may be eligible. (SD 09-08 at 2-3.) If the borrower was not approved because the result of the NPV test was negative, the borrower is entitled to request the NPV values used and to dispute those values if they are incorrect. (*Id.*) The denial letter, therefore, provides the sole formal opportunity for borrowers denied a modification to dispute or appeal the denial.

46. Bank of America's failure to comply with its obligations under HAMP and its TPP Contracts, and its failure to comply with the written and oral representations described above, have serious consequences for borrowers.

47. A homeowner's total unpaid balance increases each month that he or she is making trial payments. Trial payments are less than the amount ordinarily due under the mortgage. The rest of the amount that would ordinarily be due - in most cases, primarily interest - is not waived. Instead, the remainder of the ordinarily payment is "recapitalized" or added to the unpaid loan balance the end of the trial period. If the trial period lasts three months, only three months' worth of the difference between the trial and regular payments are added to the unpaid balance. If the trial period continues longer than three months, however, homeowners may find that six, seven, eight or more months' differential is added to the loan balance. The more Bank of America delays, the more the homeowners owe.

48. Each trial payment has negative credit consequences. Although borrowers are paying all that Bank of America is asking them to pay – and an amount that will match their payments under a permanent modification – their

accounts are not reported as current to credit scoring agencies. The HAMP directives require Bank of America to report borrowers who were previously delinquent "in such a manner that accurately reflects the borrower's delinquency and workout status." (SD 09-01 at 22.) The more months a borrower spends in limbo, the more months they are reported as delinquent, and the more months they have derogatory credit reporting.

49. Bank of America's failure to honor its obligations under HAMP and its TPP Contracts leaves homeowners in long-term limbo, unsure if they can save their homes, and unable to make rational decisions about the future. Money that could be used to fund bankruptcy plans, relocation costs, short sales, or other means of curing their default continued to go toward mortgage payments that stretch on indefinitely.

**E. PLAINTIFF'S EXPERIENCE WITH BANK OF AMERICA**

50. Plaintiff Debra Matthews' experience with Bank of America exemplifies the foregoing problems. Ms. Matthews, a working single mother, first applied to Bank of America for modification on March 23, 2009, after her job hours were reduced. By any measure, Ms. Matthews qualified for the HAMP program. Over a year later, however, Bank of America has still not completed her modification, and never properly processed her modification request in accordance with the HAMP guidelines. The following timeline summarizes Ms. Matthews' experiences over the past year.

51. On March 23, 2009, with the assistance of a local non-profit advocate, Ms. Matthews faxed a loan modification application to Bank of America. The application was also emailed to the suggested email address for applications. Receipts from the fax machine indicate that the fax was transmitted.

52. Having received no response of any kind, on April 27, 2009, Ms. Matthews' advocate called to check on the status of the application, and was told by a Bank of America representative that the application was never received. Ms.

Matthews' advocate re-faxed the loan modification application. Receipts from the fax machine indicate that the fax was transmitted.

53. On May 5, 2009, Ms. Matthews' advocate again called Bank of America to check on the status. A representative told Ms. Matthews' advocate that there was no application on file. The representative suggested faxing the application to two different numbers, both of which Ms. Matthews' advocate had already tried. Ms. Matthews' advocate nonetheless faxed the application to the two numbers again. Receipts from the fax machine indicate that the faxes were transmitted.

54. Having still received no response, Ms. Matthews' advocate escalated the loan application, after which Bank of America sent an e-mail, on May 21, 2009, stating that Ms. Matthews did not qualify for some unspecified modification program, and needed to submit updated financial information to be considered for a HAMP modification. Ms. Matthews received no direct notice of this denial whatsoever.

55. On July 6, 2009, Ms. Matthews' advocate e-mailed all the additional documentation for HAMP review to the Bank of America representative, as requested.

56. The only response Ms. Matthews received in the following months was an e-mail on August 20, 2009, stating: "Legacy Bank of America has just begun approving customers for MHA. I do see her loan is prequalified based on the imminent default requirements. The loan still has to be approved at this time. When they are approved, they will receive the terms in the mail. Please allow a few more weeks for a final decision. Thank you!!"

57. On October 16, 2009, Bank of America finally followed up, with an e-mail stating that the loan had passed "imminent default calculations" and could be run through NPV.

58. Up to this point, through desperate efforts, Ms. Matthews had been able to stay current on her mortgage. In doing so, due to a reduction in her hours at work, she was paying **more than 50%** of her **gross income** on the housing payments (and still then was only able to make interest-only payments). At this point, almost six months after she first applied for modification, Ms. Matthews had been waiting so long for help, that she finally fell behind on her payments.

59. On November 9, 2009, Ms. Matthews' advocate received a message from a Bank of America representative, stating that Ms. Matthews' modification application had passed MHA analysis, but was awaiting "confirmation."

60. On January 6, 2010, Ms. Matthews' advocate received an e-mail stating that Ms. Matthews had been approved for the MHA program, and offering Ms. Matthews specific terms, including an initial interest rate of 2%, and a trial payment of $1,487.06. The email stated that Ms. Matthews would receive documentation within 3 weeks.

61. By February 2010, having not received any documentation, Ms. Matthews' advocate again contacted Bank of America, and a representative instructed Ms. Matthews to just start making the payments and the documentation would follow. Ms. Matthews' advocate confirmed this advice with a Bank of America escalation contact, and Ms. Matthews agreed to do so.

62. When Ms. Matthews then tried to make a payment as instructed, two separate Bank of America representatives told her there was no record of her receiving a HAMP Trial Plan offer and that she therefore would need to pay the full amount of her delinquency. Ms. Matthews' advocate again escalated the issue, and a new negotiator was assigned. The new Bank of America negotiator again instructed Ms. Matthews to make the trial modification payment, and that afterwards she would receive the notice. Ms. Matthews authorized a payment of the trial amount, which was withdrawn from her account, but still never received any written notice or contract under HAMP.

63. Instead, Ms. Matthews was offered a contract for a 3 month forbearance plan for $1,000 per month, with the full unpaid balance due in June, 2010. At the same time, Ms. Matthews' advocate received an email from Bank of America saying that it was looking into the "delays with this particular MHA package," but wanted to at the very least offer the borrower some formalized plan, and that "the forbearance filled that role."

64. On April 5, 2010, after escalating Ms. Matthews' case to the Department of Treasury, Ms. Matthews' advocate was informed by a HAMP Solution Specialist that Ms. Matthews was denied for HAMP because of "inability to pay," and that she was offered a "special" forbearance plan instead. This was the first time in over a year that Bank of America has stated that Ms. Matthews, who clearly qualified for HAMP when she applied, and was in fact approved for the program, had been denied.

65. On April 15, 2010, without explanation, Ms. Matthews received a new HAMP application from Bank of America, requiring her to start the entire process over again.

66. In April 2010, Ms. Matthews also received notice from her insurer, Farmers Insurance, that Bank of America had notified them that Ms. Matthews had abandoned her home, and that her policy was therefore cancelled. Ms. Matthews of course had not abandoned her home, and she still lives there. Farmers indicated that it could not reinstate the insurance policy unless Bank of America wrote a letter to Farmers stating that the home was not in fact abandoned. Ms. Matthews twice called Bank of America to request such a letter. Both times Ms. Matthews was put on hold, then disconnected without explanation. Ms. Matthews' home, and all of its possessions, therefore remained uninsured, which was extremely upsetting to her. The situation was not resolved until Ms. Matthews' advocate got involved.

67. After many more attempts at escalations, on May 3, 2010, Ms. Matthews' advocate receive the following e-mail from a Bank of America representative:

> Good afternoon [], I do apologize for the delay. Currently this file was closed out due to non compliance. We had sent out a repay to modification paperwork to Ms. Matthews but she never returned the documents. I understand that before you were advised of a possible MHA. Unfortunately this particular loan type does not go through the MHA review. However with this being said if you would like to update Ms. Mathews work out package and send to Nicole Pratt your HERA contact here in the Advocacy dept. Thank you.

68. After 14 months of HAMP review, Bank of America thus appeared to be taking the position that Ms. Matthews loan was never eligible for HAMP review. Several days later the same Bank of America representative sent another e-mail, stating that Ms. Matthews loan would in fact be reviewed for MHA modification.

69. On May 10, 2010, Ms. Matthews resubmitted a HAMP application to Bank of America at Bank of America's request. Bank of America's escalation representative told Ms. Matthews' advocate that she did not believe the application could be expedited, but that they would receive a response within 30 days as per Bank of America and HAMP policy. On May 21, 2010, Ms. Matthews' advocate received an email from Bank of America's VP for Home Retention, stating that she had forwarded the loan for "expedited review."

70. On June 17, 2010, a Bank of America representative stated that Ms. Matthews' application was still waiting to be assigned to an underwriter. As of the date of this filing, Ms. Matthews still has not received any indication of whether her application has been approved.

/ / /

## VII. CLASS ACTION ALLEGATIONS

71. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Debra Matthews brings this action as a class action on behalf of herself and all others similarly situated as members of a proposed California class. This putative class (hereinafter the "Plaintiff Class") is defined as follows:

> All California homeowners whose loans have been serviced by one or both Defendants and who have been eligible for trial or permanent modification under the terms of HAMP Program Documentation and whose loan Bank of America has not permanently modified either because Bank of America has not offered them a TPP, or because they did not receive a permanent loan modification after they complied with their obligations under HAMP as conveyed to them by Bank of America either orally or in writing.

72. This action may properly be maintained as a class action pursuant to California Civil Code section 1781 and Fed. R. Civ. P. 23.

73. All members of the class have been subject to and affected by the same conduct. Defendants have engaged in a common course of conduct with respect to all HAMP modifications.

74. All members of the class have been subject to and affected by Bank of America's uniform failure to implement the SPA contracts. The claims are based on the terms of a contract between Fannie Mae, acting as agent for the United States Treasury, and Bank of America, acting for the benefit of the Plaintiff Class. The contract between Fannie Mae and Bank of America set out standardized steps and processes for temporary and permanent loan modifications.

75. Plaintiffs are informed and believe and on that basis allege that the Plaintiff Class is so numerous that joinder of the individual claims is impracticable. The precise number of the Plaintiff Class and the identities of the members are ascertainable from the business records of Defendants.

76. Questions of law and fact common to the Plaintiff Class exist and predominate over questions affecting only individual class members. These common legal and factual questions include, but are not limited to:

a. Whether Bank of America has violated the duty of good faith and fair dealing, inherent in all contracts, including whether the failure to provide trial or permanent HAMP modifications constitutes a breach of the covenant of good faith and fair dealing;

b. Whether Bank of America breached the TPP Contract with members of the Plaintiff Class by failing to offer members of the Plaintiff Class permanent HAMP modifications at the close of their trial periods. Whether Bank of America breached its duties under the HAMP SPA that were intended for the benefit of class members;

c. Whether Bank of America made representations that Plaintiffs and members of the Plaintiff Class would receive a trial or permanent HAMP modification, upon which Plaintiffs and members of the Plaintiff Class reasonably relied to their detriment;

d. Whether Bank of America violated the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 et seq. ("Rosenthal Act") by, without limitation, making false, deceptive or misleading representation or means in connection with the collection of any debt, making false representation or deceptive means to collect or attempt to collect on any debt, and making unfair or unconscionable means to collect or attempt to collect any debt;

e. Whether Bank of America's acts described above are unlawful, unfair, and fraudulent business practices in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. ("UCL"); and

f. The nature and extent of relief to Plaintiffs and the Plaintiff Class, including declaratory judgment, accounting, injunctive relief, restitution, and other remedies to which Plaintiffs and the other members of the Plaintiff Class are entitled.

77. Plaintiff's claims are typical of the claims of the Plaintiff Class as the claims arise from the same course of conduct by Bank of America, and the relief sought is common. Each of the members of the Plaintiff Class requested, or were otherwise eligible for, trial or permanent modification under HAMP, and met with the same failure. Each of the members of the Plaintiff Class has the same or substantially similar claims to Plaintiff for relief against these practices. As described above and below, the claims arise from the same course of conduct by Bank of America, and the relief sought is common.

78. Plaintiff is an adequate representative of the Plaintiff Class because: (a) her interests do not conflict with the interests of the individual members of the Plaintiff Class she seek to represent; (b) she has retained counsel who are competent and experienced in complex class action litigation; and (c) she intends to prosecute this action vigorously. The interests of the members of the Plaintiff Class will be fairly and adequately protected by Plaintiff and her counsel.

79. The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the Plaintiff Class. Furthermore, because the economic damages suffered by the individual class members may be relatively modest, albeit significant, compared to the expense and burden of individual litigation, it would be impracticable for members of the Plaintiff Class to seek redress individually for the wrongful conduct alleged herein. There will be no undue difficulty in the management of this litigation as a class action. Plaintiff's and the Plaintiff Class members' common claims can be

economically adjudicated only in a class action proceeding, thus promoting judicial efficiency and avoiding multiple trials and inconsistent judgments.

## VIII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

**(Breach of Contract Against All Defendants)**

80. Plaintiff, individually and on behalf of the Plaintiff Class, realleges each and every allegation above as if fully set forth in this Cause of Action.

81. Plaintiff and members of the Plaintiff Class entered into written or oral Trial Period Plan ("TPP") contracts with Bank of America. Bank of America made TPP offers, through either formal TPP Contracts, oral TPP offers, or written TPP offers. Plaintiff and members of the Plaintiff Class formed binding and enforceable agreements when they executed written TPP Contracts, and/or when they made payments under a TPP offered orally or in writing by Defendants. Payments in accordance with an executed TPP Contract or TPP offer constitute consideration. In the alternative, the TPP Contracts or offers, coupled with Plaintiff's payments, constitute implied contracts.

82. Bank of America failed to perform under the TPP contracts with Plaintiffs and members of the Plaintiff Class. Bank of America's refusal to perform its duties under the TPP contracts were unlawful, without justification and/or excuse, and constituted a total and material breach of the TPP contracts between the parties.

83. Bank of America breached the TPP contracts with Plaintiff and members of the Plaintiff Class by failing to offer Plaintiff and members of the Plaintiff Class permanent HAMP modifications after payment of the trial period payments.

84. Plaintiff and all members of the Plaintiff Class gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed under their contracts with Bank of America.

85. As a result of Bank of America's breach of the TPP contracts, Plaintiffs and members of the Plaintiff Class suffered and will continue to suffer reasonable and foreseeable consequential damages resulting from such breaches, including payment of increased interest, longer loan payoff times, higher principle balances, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and expenses incurred to prevent or fight foreclosure, and other damages for breach of contract.

86. Plaintiff and the Plaintiff Class have been damaged by Bank of America's breach of the TPP contracts in an amount to be proven at trial.

87. Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action.

**SECOND CAUSE OF ACTION**

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Breach of Covenant of Good Faith and Fair Dealing Against All Defendants)**

88. Plaintiff individually, and on behalf of the Plaintiff Class, realleges each and every allegation above as if fully set forth in this Claim.

89. Under common law, a covenant of good faith and fair dealing is implied in every contract, including the written and oral TPP contracts described above, which prevents one contracting party from unfairly frustrating the other party's right to receive the benefits of the contract. Bank of America is obligated to act in good faith and deal fairly with each borrower who entered into a TPP contract.

90. Bank of America has violated and continues to violate this covenant of good faith and fair dealing in its TPP contracts with Plaintiff and members of the Plaintiff Class by doing, inter alia, the following:

a. Failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs;

b. Failing to properly supervise its agents and employees, including without limitation, its loss mitigation and collection personnel, foreclosure personnel, and personnel implementing its modification programs;

c. Failing to permanently modify loans and/or provide alternatives to foreclosure and using unfair means to keep Plaintiff and the Plaintiff Class in temporary modification contracts, including, without limitations, routinely demanding information it already has and failing to communicate accurately or consistently with borrowers about the status of their loan modification applications; and

d. Making inaccurate calculations and determinations of Plaintiffs' eligibility for trial or permanent modifications.

91. Plaintiffs remain ready, willing, and able to enter into permanent HAMP modifications.

92. As a result of Bank of America's breach of this implied covenant, Plaintiff and members of the Plaintiff Class suffered and will continue to suffer reasonable and foreseeable consequential damages resulting from such breaches, including payment of increased interest, longer loan payoff times, higher principle balances, and other damages for breach of contract.

93. Plaintiff and the Plaintiff Class have been damaged by Bank of America's breach of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

94. Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action.

**THIRD CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(Breach of SPA Contract**

**Against All Defendants)**

95. Plaintiff individually, and on behalf of the Plaintiff Class, realleges each and every allegation above as if fully set forth in this Claim.

96. On April 17, 2009, Bank of America and the United States (through Fannie Mae acting as Financial Agent of the United States) entered into the Servicer Participation Agreement ("SPA") which is a valid and enforceable contract.

97. Plaintiff and members of the Plaintiff Class are intended third-party beneficiaries under the SPA, and the SPA states the express intention that "homeowners who are in default and . . . who are at imminent risk of default" be granted modification to reduce 'monthly payments to sustainable levels." (SD 09-01 at 1.)

98. By entering into the SPA, Bank of America agreed to comply with the requirements set forth in the SPA and the Program Documentation incorporated by reference into the SPA. In exchange, Treasury agreed to pay certain amounts set forth in the SPA and the Program Documentation to Bank of America in consideration of its compliance with the SPA.

99. The central purpose of the SPA is to ensure that borrowers whose loans are serviced by Bank of America and who are eligible for loan modifications

under HAMP are properly considered for modification in compliance with the Program Documentation requirements incorporated in the SPA.

100. Bank of America failed to perform under its SPA contracts in a manner that directly impacts Plaintiffs and members of the Plaintiff Class. Bank of America's refusal to perform the SPA contracts was unlawful, without justification and/or excuse, and constituted a total and material breach.

101. Bank of America breached the SPA by doing, inter alia, the following:

a. Failing to properly determine whether Plaintiff and members of the Plaintiff Class qualify for HAMP modifications by checking investor restrictions and/or performing an NPV test;

b. Imposing requirements on Plaintiff and the Plaintiff Class not permitted under the SPA and Program Documentation;

c. Failing to follow the process required to determine eligibility for modifications, including, without limitations, failing to consider documentation properly submitted in support of their HAMP applications, and demanding documentation that is not required;

d. Failing to obtain waivers or approvals from the investor, if necessary, to carry out modifications under HAMP; and

e. Failing to timely convert temporary modifications into permanent modifications in the manner required by the SPA.

102. As a result of Bank of America's breach of the SPAs, Plaintiff and members of the Plaintiff Class suffered and will continue to suffer reasonable and

foreseeable consequential damages resulting from such breaches, including payment of increased interest, longer loan payoff times, higher principle balances, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and expenses incurred to prevent or fight foreclosure, and other damages for breach of contract.

103. Plaintiff and the Plaintiff Class have been damaged by Bank of America's breach of the SPA contract in an amount to be proven at trial.

104. Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action.

**FOURTH CAUSE OF ACTION**

**PROMISSORY ESTOPPEL, IN THE ALTERNATIVE**

**(Against All Defendants)**

105. Plaintiff individually, and on behalf of the Plaintiff Class, realleges each and every allegation above as if fully set forth in this Claim.

106. Bank of America, by way of the TPP contracts described above, made a representation to Plaintiffs that if they agreed to the terms of a TPP proposal, either by returning an executed TPP Contract, or making the proposed trial payments, they would receive a permanent HAMP modification.

107. Bank of America's TPP contracts were intended to induce Plaintiffs to rely on them and make monthly TPP payments and Plaintiffs did, indeed, rely on Bank of America's representations, by submitting TPP payments. Plaintiffs' reliance was reasonable.

108. Plaintiffs' reliance was to their detriment. For example, those who complied with the TPP contracts but were denied a permanent modification lost the opportunity to pursue other strategies and those plaintiffs who have yet to receive permanent HAMP modifications and are still making TPP payments have

lost the opportunity to fund other strategies to deal with their default and avoid foreclosure.

109. Plaintiff and the Plaintiff class have been damaged by Bank of America's actions and representations in an amount to be proven at trial.

110. Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF STATE FAIR DEBT COLLECTION ACT**

**(Violation of the Rosenthal Fair Debt Collection Practices Act,**

**Cal. Civ. Code § 1788 *et seq.***

**Against All Defendants)**

111. Plaintiff individually, and on behalf of the Plaintiff Class, realleges each and every allegation above as if fully set forth in this Claim.

112. Bank of America is a "debt collector" within the meaning of Cal. Civil Code §1788.2(c). The monies allegedly owed by the members of the proposed classes are "debts" within the meaning of Cal. Civil Code §1788.2(d).

113. California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 et seq. ("Rosenthal Act"), incorporates by reference, and requires compliance with, the provisions of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et. seq. Cal. Civ. Code § 1788.17.

114. By the acts and practices described herein Bank of America has violated these laws, as follows, without limitations:

a. Making false, deceptive, or misleading representation or means in connection with the collection of any debt, 15 U.S.C. § 1692e;

b. Making false representation or deceptive means to collect or attempt to collect on any debt, 15 U.S.C. § 1692e(10); and

c. Making unfair or unconscionable means to collect or attempt to collect any debt, 15 U.S.C. § 1692f.

115. Pursuant to California Civil Code §§ 1788.30 and 1788.17, Plaintiff and the Plaintiff Class are entitled to recover actual damages sustained as a result of Bank of America's violations of the Rosenthal Act. Such damages include, without limitation, monetary losses and damages, and emotional distress suffered, which damages are in an amount to be proven at trial. In addition, pursuant to California Civil Code §§ 1788.30 and 1788.17, because Bank of America's violations of the Rosenthal Act were committed willingly and knowingly, Plaintiffs and the Plaintiff Class are entitled to recover penalties of at least $1,000 per violation as provided for in the Act.

116. Pursuant to California Civil Code §§ 1788.30 and 1788.17, Plaintiffs and the Plaintiff Class are entitled to recover all attorney's fees, costs, and expenses incurred in the bringing of this action pursuant to Civil Code § 1788.30(c).

**SIXTH CAUSE OF ACTION**

**VIOLATION OF THE UNFAIR COMPETITION LAW**

**(For Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et. seq.***

**Against All Defendants)**

117. Plaintiff individually, and on behalf of the Plaintiff Class, realleges each and every allegation above as if fully set forth in this Claim.

118. The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), defines unfair competition to include any "unlawful," "unfair," or "deceptive" business act or practice. Cal. Bus. & Prof. Code § 17200.

The UCL authorizes this Court to issue whatever orders or judgments may be necessary to prevent unfair or unlawful practices, or to "restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." *Id.* § 17203.

119. Bank of America's acts and practices alleged herein are unlawful business practices in that they violate state law, including but not limited to violations of the Rosenthal Act, as alleged in this Complaint.

120. Bank of America's acts and practices alleged herein constitute unfair business practices, including, without limitation, the following practices:

a. Failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs and the Plaintiff Class and its responsibilities under HAMP;

b. Failing to properly supervise its agents and employees, including without limitation, its loss mitigation and collection personnel, foreclosure personnel, and personnel implementing its modification programs;

c. Failing to permanently modify loans and/or provide alternative to foreclosure and using unfair means to keep Plaintiffs and the Plaintiff Class in temporary modification contracts, including, without limitations, routinely demanding information it already has and failing to communicate accurately or consistently with borrowers about the status of their loan modification applications;

d. Making inaccurate calculations and determinations of Plaintiffs' eligibility for permanent modifications; and

e. Engaging in acts and practices that prolong of the HAMP process.

121. Bank of America's acts and practices alleged herein constitute fraudulent business practices, including, without limitation, the following practices:

a. Bank of America has made and continues to make misrepresentations and omissions of material fact that induce Plaintiffs and members of the Plaintiff Class to enter TPP contracts in order to obtain a permanent modification;

b. Bank of America has made and continues to make misrepresentations and omissions of material fact regarding the status of Plaintiff's and members of the Plaintiff Class's loan modifications and loan payments;

c. Bank of America's misrepresentations and omissions are likely to deceive the reasonable consumer;

d. Bank of America's misrepresentations are objectively material to the reasonable consumer, and therefore reliance upon such representations may be presumed as a matter of law; and

e. Plaintiff and members of the Plaintiff Class reasonably and justifiably relied on such misrepresentations.

122. As a result of these violations and unlawful, unfair, and fraudulent business practices, Plaintiffs suffered injury in fact and lost money and property, including but not limited to, payment of increased interest, longer loan payoff times, higher principle balances, and payment of other charges collected by Bank of America.

123. Pursuant to California Business and Professions Code section 17200 *et seq.*, Plaintiffs the Plaintiff Class are entitled to enjoin the practice of unfairly denying and failing to enter into permanent loan modifications for homeowners

who have complied with the contractual obligations in Paragraph 1 of the TPP Contract, and grant such other and further relief as the Court may deem proper and just.

124. Pursuant to Code of Civil Procedure § 1021.5, Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. The Court find and issue an order certifying the Plaintiff Class under Federal Rules of Civil Procedure, rule 23 and appointing the named Plaintiff to be class representatives and their counsel to be class counsel;

2. The Court grant a temporary restraining order preventing foreclosure of Plaintiff's property;

3. The Court enter a judgment declaring Bank of America's acts and practices complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing and to be unlawful, unfair, and fraudulent, as well as a declaration that Bank of America is required by the doctrine of promissory estoppel to offer permanent modifications to class members;

4. That this Court award Plaintiff and Plaintiff Class actual and statutory damages in an amount according to proof for Bank of America's violations of the Rosenthal Act, breach of contract, breach of covenant of good faith and fair dealing, and promissory estoppel or, in the alternative, that Bank of America be ordered to make restitution to Plaintiffs and members of the Plaintiff Class pursuant to California Business and Professions Code § 17203;

5. The Court grant a permanent order enjoining Bank of America's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff and the members of the Class from engaging in the unlawful, unfair and

fraudulent practices alleged herein and order specific performance of Defendants' contractual obligations, under the TPP Contract and SPA, together with other relief required by contract and law;

6. The Court award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorney's fees, cost and expenses under Cal. Civ. Proc. Code § 1021.5, Cal. Civ. Code §§ 1788.17 and 1788.30(c);

7. The Court grant Plaintiff and members of the Plaintiff Class pre-judgment interest on all sums collected;

8. The Court grant Plaintiff and the Plaintiff Class such other and further relief as this Court finds necessary and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of each and every claim so triable.

Dated: July 26, 2010

**HOUSING AND ECONOMIC RIGHTS ADVOCATES**

**COTCHETT, PITRE & McCARTHY**

By: ______________________

NIALL P. McCARTHY
JUSTIN T. BERGER
*Attorney for Plaintiffs*